**IN RE WILL OF KRANTZ**

[135 N.C. App. 354 (1999)]

———————————

IN THE MATTER OF THE WILL OF KENNETH MASON (JACK) KRANTZ, JR., DECEASED

No. COA98-1568

(Filed 19 October 1999)

**Wills— nuncupative—summary judgment improper**

The trial court erred in granting summary judgment in favor of the caveator in a proceeding involving the probate in solemn form and caveat of decedent's nuncupative will under N.C.G.S. § 31-3.5 because there are genuine issues of material fact: (1) whether decedent, at the time he dictated his desired dis-

position of his personal property, reasonably believed he was in the last stage of a chronic disease; and (2) whether he was indeed in the last stage of a chronic disease.

Appeal by duly appointed executor and propounder Plato S. Wilson from judgment filed 10 November 1998 by Judge Catherine C. Eagles in Guilford County Superior Court. Heard in the Court of Appeals 21 September 1999.

*Wyatt Early Harris & Wheeler, L.L.P., by William E. Wheeler, for propounder-appellant.*

*Roberson Haworth & Reese, P.L.L.C., by Robert A. Brinson and Elizabeth M. Koonce, for caveator-appellee.*

GREENE, Judge.

Plato Wilson, Propounder-Appellant (Propounder), as executor for the estate of Kenneth Mason (Jack) Krantz, Jr. (Decedent), appeals the granting of summary judgment for Roger Krantz, Caveator-Appellee (Caveator), in a proceeding involving the probate in solemn form and caveat of Decedent's nuncupative will.

The facts reveal Decedent died at his residence in High Point, North Carolina, on Sunday, 1 June 1997, from cardiac arrest. Decedent was divorced, had no children, and had no close living relatives. Caveator, Decedent's cousin, is Decedent's closest living relative and only living heir-at-law. At the time of his death, Decedent was in poor health and suffered from severe hypertensive disease (high blood pressure), pernicious anemia, and alcoholism for many years. Decedent's decomposed body was not discovered until Wednesday, 4 June 1997, three days after his death.

Gordon B. Arnold, M.D. (Dr. Arnold), an internal medicine practitioner, had been Decedent's doctor since 1982. He treated Decedent for several infirmities, most notably high blood pressure. On 23 May 1997 Decedent visited Dr. Arnold at his office. During this visit, Dr. Arnold did not believe Decedent was suffering from a terminal condition, was in a life threatening condition, required hospitalization or nursing care, or was in imminent danger of death. In retrospect of Decedent's death, however, "something serious was culminating with Decedent," because his blood pressure was higher than on his previous visit, he was fatigued, he had insomnia, and he had lost weight since his last visit. Decedent "might have lived another five years with

his condition," if he was compliant with his treatment, but he "was at the peak, probably, of a deterioration in his cardiac status" on the 23 May 1997 visit.

Two of Decedent's closest friends were Propounder and Harriet (Hacky) Pitts. On Saturday, 31 May 1997, Decedent requested Propounder and Hacky to come to his home that evening for dinner, socializing, and to look over some of the decorating work Decedent had prepared for Propounder's cottage in the mountains. Propounder had no idea or impression Decedent's death was imminent on this day, but Decedent told Hacky that he was sick, and he was "just sitting . . . [there] waiting to die." Decedent was, however, able to drive to the grocery store earlier that day and to cook frozen lasagna for his guests that evening.

After looking at Decedent's decorative accessories for Propounder's cottage, gossiping over a glass of wine, and then eating dinner, Decedent, Hacky, and Propounder went into the living room where Decedent told Hacky and Propounder, "I want to dictate—give you my oral will." Propounder and Hacky were both taken aback by Decedent's statement. Eventually, after finding pens and paper, Propounder and Hacky began taking contemporaneous notes of Decedent's wishes for the disposition of his personal property. Propounder took more detailed notes of Decedent's dictation than Hacky. The dictation took about forty-five minutes. After Propounder had written Decedent's statements, Propounder and Hacky signed the bottom of Propounder's notes. Decedent did not sign these notes, and none of the notes are in his handwriting.

Hacky left shortly after she and Propounder witnessed Decedent's recitation because she had a previous engagement. Propounder congratulated Decedent for doing something verbally with his estate, and he and Decedent spent the rest of the evening talking about Decedent going to the Mountains to install the accessories for Propounder's cottage. After leaving Decedent's home that evening, Propounder took the handwritten notes home and placed them on his desk. The next day, before going to the mountains, Propounder moved the notes from his work area to his "to do" pile of papers on his desk. Following the evening of 31 May 1997, Propounder did not check on Decedent. Hacky spoke with Decedent by telephone the following morning, 1 June 1997. During this conversation, Decedent told Hacky he had driven to Harris Teeter to buy some groceries earlier that day. Decedent said he was embarrassed, because he had gotten dizzy while shopping and had to leave the

store and a cart full of groceries to go sit in his car before he could drive home. During this conversation, Decedent also told Hacky how much he appreciated her and Propounder coming over the night before and asked her if she would take care of his dog when he died. Hacky said "of course" she would.

Hacky then went out of town to visit a sick friend of hers and did not speak to Decedent after that telephone conversation. On her return journey from her sick friend's home, Hacky tried to reach Decedent by telephone several times but could not get any answer. Still worried about Decedent, Hacky had her son accompany her to go and check on him on the afternoon of Wednesday, 4 June 1997. When Hacky and her son arrived at Decedent's house, they saw Decedent's body on the floor of his living room with his dog beside him barking. To report what they had seen, they made a telephone call to the High Point Police Department and it was the police who broke into Decedent's house to discover his decomposing body.

Subsequent to Decedent's death, Propounder submitted an affidavit to the clerk of court seeking to probate the purported will of Decedent. On 11 June 1998, Caveator filed a Caveat challenging the validity of the purported will.

---

The dispositive issue is whether Decedent was in his "last sickness" at the time he dictated his desired disposition of his personal property.

Section 31-3.5 of the North Carolina General Statutes provides the basis for creating a valid nuncupative will. This statute provides:

A nuncupative will is a will

(1) Made orally by a person who is in his *last sickness* or in imminent peril of death and who does not survive such sickness or imminent peril, and

(2) Declared to be his will before two competent witnesses simultaneously present at the making thereof and specially requested by him to bear witness thereto.

N.C.G.S. § 31-3.5 (1984) (emphasis added).

Propounder argues Decedent made the statements concerning how to distribute his estate in his "last sickness."[1]

---

1. Propounder makes no contention that Decedent's oral statements were made while he was "in imminent peril of death" and we need not, therefore, address that matter in this appeal.

Our legislature provides no statutory definition of "last sickness." It is well accepted, however, that "last sickness" has reference to the sickness or illness that eventually results in the decedent's death. 2 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 20.15, at 303 (1960). It is equally well accepted that "last sickness" "does not include early or intermediate stages of a chronic disease, although it is the disease of which testator eventually dies." *Id.* "It is therefore an acute disease, or the last stage of a chronic disease in which it assumes the form in which death directly ensues, that is meant by a 'last illness,' and not the entire duration of progressive disease which ultimately results in death." *Id.* at 304. Furthermore, the testator must reasonably believe that he suffers from an acute disease which results in his death or is in the last stages of a chronic disease which results in his death. *Id.* at 305. There is no bright line for determining whether the testator is in the *last stage* of a chronic disease, but the term generally has reference to whether death is "about to occur" or is "imminent." *See Kennedy v. Douglas*, 151 N.C. 336, 339, 66 S.E. 216, 217 (1909) (testator not in "last sickness" when she lived nine months after giving oral instructions for the disposition of her property).

Whether a person was in his "last sickness" is generally a question of fact for the jury and not subject to summary judgment.[2] 1 Norman A. Wiggins, *Wills and Administration of Estates in North Carolina* § 30, at 50 (3d ed. 1993); *In re Will of Belvin*, 261 N.C. 275, 277, 134 S.E.2d 225, 226 (1964) (issues raised in caveat proceeding to be decided by jury).

In this case, Decedent died as a result of a chronic disease. There are, however, genuine issues of fact as to whether Decedent reasonably believed he was in the last stage of a chronic disease and whether Decedent was indeed in the last stage of a chronic disease.[3] Accordingly, summary judgment was not appropriate and therefore must be reversed and remanded for trial. *See Ragland v. Moore*, 299

2. Indeed there is some argument, an issue we need not address in this appeal, that summary judgment is never appropriate in a proceeding challenging the validity of a will. *See Burney v. Holloway*, 225 N.C. 633, 636, 36 S.E.2d 5, 7 (1945) (caveat proceeding not subject to directed verdict at the instance of any of the parties). *But cf. In re Will of Edgerton*, 29 N.C. App. 60, 62, 223 S.E.2d 524, 526, (summary judgment proper to raise issue of whether caveator had standing to contest the will), *disc. review denied*, 290 N.C. 308, 225 S.E.2d 832 (1976).

3. We do not intend to suggest that multiple issues must be submitted to the jury. Indeed the single issue for the jury is whether Decedent was in his "last sickness" at the time he orally expressed his wishes for the disposition of his personal property.

N.C. 360, 363, 261 S.E.2d 666, 668 (1980) (a trial court does not resolve issues of fact and must deny any motion for summary judgment if there is a genuine issue as to any material fact).

Reversed and remanded.

Judges WALKER and HUNTER concur.